Matthias, J.
The first question for determination in this cause may adequately be framed as follows:
Does Section 5501.112, Eevised Code, authorize, and do the agreement between relator and the School Employees Eetirement Board and the actions of the parties thereunder amount to, the creation of a debt of the state in violation of Sections 1, 2c, or 3 of Article VIII, Ohio Constitution?
Section 1, Article VIII of our Constitution, provides:
“The state may contract debts, to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the General Assembly, or at different periods of time, shall never exceed seven hundred and fifty thousand dollars; and the *453 money, arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever.”
Section 2 of Article VIII states in part:
“In addition to the above limited power, the state may contract debts to repel invasion, suppress insurrection, defend the state in war, or to redeem the present outstanding indebtedness of the state * *
And Section 3 of the same Article provides:
“Except the debts above specified in Sections one and two of this Article, no debt whatever shall hereafter be created by, or on behalf of the state.”
Before determining whether the agreement in dispute creates a debt of the state in violation of the above constitutional provisions, it will first be necessary to examine the statute authorizing such agreements. If the statute is invalid because it constitutes such an illegal authority, then it must follow that the agreement, authorized by that statute, must also fall. The statute in.question, Section 5501.112, Revised Code, after authorizing the Director of Highways to purchase real property that he deems will be necessary for the improvement of the state highway system, proceeds to authorize him to enter into agreements with the School Employees Retirement Board (and other enumerated state agencies) concerning acquisition of land for such improvements. Under such agreements, the Director of Highways acts as agent of the board in the purchase of the land but such land is purchased with the board’s funds and title in fee simple is taken in the name of the board. The concluding part of the statute relates to the subsequent purchase of the property by the Director of Highways on behalf of the state from the board. When the latter purchase is consummated title then is vested in the state of Ohio.
The essential provisions of Section 5501.112, Revised Code, as pertinent to the objection that it authorizes an illegal debt must now be set out:
“* * * Each such agreement may not extend beyond the then current two-year period for which appropriations to the Department of Highways shall have been made by the General Assembly. The agreements may contain options for the *454 renewal thereof for an additional period or periods, of not exceeding two years each; provided, however, that no snch agreement may be renewed to extend beyond five years from the date of the original agreement.
“* * * during the effective period of each such agreement the director shall purchase such property from the * * * retirement board whenever such a highway improvement contract is let, or upon expiration of such agreement, whichever date is earlier.”
It seems clear that expenditures for the acquisition of highway rights of way, such as involved here, are not in the nature of an expense that is inseparable, inherent and absolutely necessary to the carrying on of the functions of government or any department of government made necessary by provision of law. In other words, the expenditure here is not a “current expense of government” which would render it a nondebt and remove it from the inhibition of Article VIII of the Constitution. See State, ex rel. Ross, v. Donahey, 93 Ohio St., 414, 113 N. E., 263.
And Section 2 of Article VIII of the Constitution, which permits the state to contract debts in certain specified instances of extreme state emergency, obviously is not applicable here. And, of course, the expenditure here exceeds $750,000, the maximum amount of debt allowable under Section 1 of Article VIII. It is clear, therefore, that the prohibition of Section 3 of Article VIII, to wit, that no debt whatsoever may be created by or on behalf of the state, must determine the validity of the expenditure in question, since the exceptions in Sections 1 and 2 have no application.
The finance and expenditure system of this state and the constitutional prohibition against debts were ably and elaborately dealt with by Judge Swan in the leading case of State v. Medbery, 7 Ohio St., 522. For more than one hundred years this landmark case has represented the law of this state on the subject of state indebtedness. In that controversy, the Ohio Board of Public Works, pursuant to statutory authorization, had entered into contracts on behalf of the state, obligating the state to pay to certain contractors $1,375,000 for material and repairs of certain canals within the state for a period *455 of five years. The court held the contracts to he invalid. That determination was based upon the fact that such contracts created illegal debts of the state in that they constituted present obligations to pay money at a future time, without appropriations and revenue provided.
In his opinion, written in 1857 and interpreting the provisions of the Constitution of 1851, Judge Swan pointed out that the keystone of our whole system of finance and expenditure is the constitutional provision prohibiting the Legislature from making any appropriation of funds for a period exceeding two years. (Section 22, Article II of the Constitution.) A moment’s reflection upon this cardinal principle may serve to point up its extreme intrinsic value. The reasons for its significance were well stated by Judge Swan in his opinion at page 541:
(Quoting pertinent constitutional provisions.) “1. The General Assembly at each biennial session determine the amount of the expenditure for the two years of their official term, in all cases not otherwise predetermined by the provisions of the Constitution; 2. They must take the responsibility of making the necessary appropriations for this purpose, otherwise no money can be paid; 3. They must assess a tax upon their constituency sufficient in amount to meet the appropriations.
“There is a wholesome, practical wisdom in the two constitutional provisions, which require appropriations for expenditures, and the assessment of taxes to meet them, to be made by the same General Assembly. Each member is thus compelled, during his official term, to visit upon his constituents the pecuniary consequences of his sanction of liabilities to be incurred and of appropriations made. * * * Payment not only goes hand in hand with expenditure, but wasteful expenditures, instead of being concealed or mitigated by delay of payment or the creation of debts, must be immediately made known to the people through the demands of the tax gatherer for the money.”
Are the contracts in the Medbery case distinguishable from the agreement at bar. and from the agreements authorized by Section 5501.112, Revised Code? We are of the opinion that they are clearly dissimilar. The Medbery case was concerned with five-year contracts, whereas the statute and agreement at *456 bar contemplate contracts of not more than two years’ duration. The first objection to the canal contracts involved in the Medbery case was based upon the fact that no appropriation had been made for such purpose, contrary to the mandate of the Constitution. And a specific appropriation to support a five-year contract was not possible since the General Assembly first authorizing the canal repair could not appropriate beyond its two-year life and hence any initial appropriation necessarily lapsed at the end of that General Assembly’s biennium. Secondly, the contracts were objectionable because they attempted to bind future General Assemblies by requiring them to satisfy the five-year obligations and thus infringed upon the legislative prerogative to make appropriations.
The statute and agreement in question have been carefully, designed to avoid such unconstitutional consequences. In essence they require the presence of the two basic safeguards glaringly absent from the canal contracts in the Medbery case, to wit, (1) they require that appropriations be made and revenue provided for each two-year obligation (which Judge Swan characterized as “constitutional compliance”) and (2) they specifically provide that each agreement may not extend beyond two years. It follows that, since funds have been appropriated for highway improvements in the nature of those involved herein by the 103rd General Assembly, no debt accrued as a result of the agreement in question, notwithstanding that there is a lapse of time between accrual of the claim and its actual payment. In this regard, Judge Swan stated in the Medbery case at page 530:
“Under this system of prompt payment of expenses and claims as they accrue, there is undoubtedly after the accruing of the claim and before its actual presentation and payment, a period of time intervening in which the claim exists unpaid; but to hold that for this reason a debt is created, would be the misapplication of the term debt, and substituting for the fiscal period a point of time between the accruing of the claim and its payment for the purpose of finding a debt; but appropriations having been previously made and revenue provided for payment as prescribed by the Constitution, such debts, if they may'be so called, are, in fact, in respect of the fiscal year, pro *457 vided for, with a view to immediate adjustment and payment. Such financial transactions are not therefore to be deemed debts.” (Emphasis added.)
Now we turn to the problem of whether the provision of the statute (and also of the agreement) granting to the Director of Highways an option to renew the original agreement thereby destroys the otherwise valid nature of the statute and transforms it into an authorization to enter into contracts of the type forbidden in Medbery. The statute and the agreement provide that any renewal agreement cannot exceed two years in duration, and that all renewals must terminate within five years from the date of the original agreement.
While it is true that if the renewal option were placed in the absolute discretion of the director, then clearly the statute would constitute an authorization to contract to expend money at a future time without appropriation made and revenue provided, in violation of the principles laid down in Medbery, the statute is not to be so construed. The option to renew is not absolute but is conditional. If the first sentence of the' statute (as quoted, supra) is to be given effect, it becomes obvious that the General Assembly intended that, in the event the original agreement is renewed, the renewal agreement is to be considered a new and separate agreement and not the extension of an old obligation. Any other construction of the statute would not be consistent with the clear and unambiguous language that “each such agreement may not extend beyond the current two-year period.”
Also in this regard, a distinction must be made between contracts containing options to “renew” for a given term or terms and those containing options to “extend” for a given term. A contract containing an option to renew has the effect of granting a right to execute a new contract upon exercise of the option and the new contract is operative immediately after the terminal date of the original agreement. In other words, a contract containing a renewal option constitutes a present grant only for the original term, and a new contract must be executed at the end of such term if the option to renew is to be exercised. On the other hand, a contract which may be characterized as one containing an option to extend an agreement *458 constitutes a present grant which, upon exercise of the option, operates to extend the term of the original agreement and the contract then becomes one for both the original and the extended term. 24 Cyc., 1008; 16 R. C. L., 885, Section 389; Helena Light & Ry. Co. v. Northern Pacific Ry. Co., 57 Mont., 93, 186 P., 702; Leroux & Co., Inc., v. Merchants Distilling Corp., 165 F. (2d), 481; Flynn v. Bachner, 168 Mich., 424, 134 N. W., 451, Ann. Cas. 1913C, 641.
Consequently, in the case at bar, in the event of a proper exercise of the option to renew, the original agreement will automatically be extinguished as of its terminal date, and a new and distinct contract must be created to take its place Assuming legislative sanction of the renewal in the form of an enabling appropriation enacted by a new General Assembly, the new contract, by virtue of the intentions of the parties, must incorporate the same terms and any unexecuted obligations contained in the prior agreement.
(Incidentally, the language of the statute referring to the “original agreement” further substantiates the conclusion that separate plural agreements were contemplated in the event of the exercise of the option to renew.)
Keeping in mind that separate agreements were contemplated by the General Assembly, what is the limitation on the power of the director to renew? That limitation becomes very apparent when one considers that the new agreement-will constitute a new claim against the state. And it is axiomatic in this state that any of its executives intending to enter into obligations of the state involving the expenditure of funds must first consider and comply with two fundamental rules. The first of these is Section 131.17, Revised Code, prohibiting any executive of the state from entering into an agreement involving the expenditure of funds unless the Director of Finance first certifies that there is a balance in the appropriation, not otherwise obligated, pursuant to which such obligation is required to be paid. Compliance with such section is commonly known as “obtaining a certificate of the availability of funds.” This statute represents a codification of the safeguard against indebtedness as provided in the Constitution and as interpreted in the Medbery case. The second rule such executive *459 must consider is found in Section 22, Article II of the Constitution. This section forbids every executive officer from paying any claim unless there has been a specific appropriation by law for that purpose.
It is seen, therefore, that the provisions of the statute in controversy (Section 5501.112, Revised Code) do not stand alone. The statute must be read in pari materia with Section 131.17, Revised Code, and both such sections implement the provisions contained in Section 22, Article II of our Constitution. Since the statute provides for separate agreements, we must infer that the lawmakers, in granting a renewal power to the Director of Highways, intended for that power to be exercised in compliance with other well known provisions of the law. Where a statute clearly confers power to do a certain thing without placing any limitation as to the manner or means of doing it, and no statute can be found prescribing the exact mode of performing that duty or thing, the presumption is that it should be performed in a reasonable manner not in con-diet with any law of the state. State, ex rel. Atty. Genl., v. Morris, 63 Ohio St., 496, 512, 59 N. E., 226.
It should be noted that the parties to this agreement have recognized that limitations must be placed upon the director’s power of renewal. Paragraph 7 of that agreement specifically conditions the right of renewal on the furnishing of a certificate from the Director of Finance that “for the next ensuing biennium there is or will be a balance in the appropriation made for the Department of Highways in a then existing act of the General Assembly appropriating funds to said department and available during such ensuing biennium to meet the obligation incurred by the election to renew.”. Such a provision satisfies both the spirit and the letter of the Constitution and the principles set out in the Medbery case. It assures that, in undertaking this renewal obligation on behalf of the state, “appropriations have been made and revenue provided” for that purpose. Thus, the parties to the agreement have made their actions consistent with this state’s long-standing system of finance and expenditure.
Even assuming that the renewal power created by the statute is properly limited, the respondent herein contends that *460 no valid certificate can issue to enable creation of a renewal agreement because tbe prerequisite new appropriation act will not be in effect until after tbe terminal date of tbe present agreement, June 30, 1961. Tbe agreement specifically provides that any renewal must be accomplished before sucb date. However, even if there were no sucb provision in tbe agreement, renewal would have to be effected before tbe termination of tbe biennium, since an obligation supported by an appropriation but remaining unpaid at tbe end of a biennium accrues into a debt at sucb time. State v. Medbery, supra, at page 530. Consequently, tbe respondent claims that the finance director cannot issue a certificate as to a fund that “has not yet come into legal existence.” What respondent fails to take into account is that it is possible for tbe new General Assembly, by prompt action, to pass an appropriation act which will become law before tbe end of tbe old biennium. Sucb action would enable a certificate to issue before July 1, 1961.
It is also to be noted that in tbe event an agreement sucb as tbe one at bar is entered into after tbe beginning of a current biennium, such agreement could, in no event, extend beyond tbe terminal date of that current biennium.
Tbe design of Section 5501.112, Revised Code, and of any agreements created thereunder, is to provide a method for tbe financing of tbe cost of advance acquisition of land for highway purposes. We deem it proper at this time to observe that tbe mechanics of this statute, and any agreements created thereunder, will require a timely appropriation act by tbe General Assembly for such purpose in order for tbe renewal feature of tbe statute and of tbe agreements to operate. Time will be of tbe essence as to sucb legislation. If tbe mandates contained in Section 131.17, Revised Code, are to be complied with, sucb an appropriation act must become existing law before tbe end of tbe then current fiscal biennium.
In summary, tbe statute and tbe agreement here in issue do not create or authorize tbe creation of a debt of the state for tbe following reasons: (1) An appropriation is in existence to support tbe original agreement, (2) a new appropriation is made a necessary prerequisite to a renewal of tbe agreement, as is compliance with Section 131.17, Revised Code, (3) only con *461 tracts not exceeding two years duration are authorized by this statute and by the agreement, and (4) subsequent General Assemblies are in no way bound by this agreement or the renewals thereof.
The next question raised by respondent is whether the expenditure of funds for the advance acquisition of rights of way constitutes an expenditure for statutory highway purposes within the meaning of Section 5a of Article XII of the Ohio Constitution, which-provides as follows:
“No moneys derived from fees, excises, or license taxes relating to registration, operation, or use of vehicles on public highways, or to fuels used for propelling such vehicles, shall be expended for other than costs of administering such laws, statutory refunds and adjustments provided therein, payment of highway obligations, costs for construction, reconstruction, maintenance and repair of public highways and bridges and other statutory highway purposes, expense of state enforcement of traffic laws, and expenditures authorized for hospitalization of indigent persons injured in motor vehicle accidents on the public highways.”
To be a statutory highway purpose, such purpose must, first, be one which is authorized by statute and, second, be one which is so related to the development, of the highway system that it is within the power of the General Assembly to authorize the expenditure of public funds therefor.
There is no question that the director is authorized by statute to make such purchases of rights of way prior to actual need.
Section 5501.112, Revised Code, reads in part as follows:
“The Director of Highways, in addition to his other duties and power provided by law, is authorized to purchase real property that he deems will be necessary for the improvement of the state highway system by the following method * * *.”
The only question which remains is whether such prior acquisition is, in the absence of an immediate need of the right of way, such a highway purpose that the General Assembly has the power to authorize the expenditure of public funds therefor. There can be no question .that the procurement of rights of way for highways is a highway purpose. Does the acquisition of *462 such rights of way far in advance of actual construction remove such acquisition from its status as a highway purpose? We do not think so.
The planning and construction of highways is a long-term procedure. It is not an undertaking which can be planned and consummated on the spur of the moment. The development and construction of the superhighway system essential to the movement of modern traffic necessitate the planning of highways and the acquisition of rights of way far in advance of actual construction. To wait until there is a present actual need for construction purposes before acquiring the right of way is neither economical nor practical. With the mushrooming of metropolitan areas and the expansion of suburban living, it is not only necessary but essential that plans be developed and rights of way acquired far in advance of actual construction, not.only to obviate the'increase in cost due to the development of areas through which highways must pass but also to afford an opportunity for the planned development of the communities themselves.
Respondent also urges, in respect to the limitation contained in Section 5a, Article XII of the Ohio Constitution, that the power to acquire whole tracts, when only a part thereof may eventually be used for highway purposes, removes such acquisition from the meaning of a highway purpose.
Section 5501.111, Revised Code, provides in part as follows :
“The Director of Highways may purchase property in fee simple in the name of the state by warranty deed, all or any part of a tract of land when the acquisition of a part of said land needed for highway purposes will result in substantial damages to the residue by severance, controlled access or isolation.”
It is again a matter of practical economics with' which we are dealing. In many instances the cost would be less in acquiring a whole tract than in acquiring a mere right of way and paying damages to the owner of the residue. Under the present method the director may use that part of the tract which he needs for construction and dispose of the remainder to private individuals for commercial or private use. It is not incon *463 ceivable that the remainder conld be disposed of at a price which would render the actual cost of the right of way negligible.
It must be remembered that the sections with which we are concerned do not give the Director of Highways carte blanche to purchase any real estate he pleases. While he is given a wide discretion, it can only be exercised with relationship to his statutory powers, and he cannot abuse such discretion.
Clearly the prior acquisition of property deemed necessary for the improvement of the state highway system constitutes a statutory highway purpose within the meaning of Section 5a of Article XII of the Ohio Constitution.
Respondent also contends that the expenditure of funds for prior acquisition of highway rights of way violates Section 2c of Article VIII of the Ohio Constitution, which provides in part as follows:
“The state .may contract debts not exceeding five hundred million dollars for the purpose of providing moneys for acquisition of rights of way and for construction and reconstruction of highways on the state highway system.”
Since the acquisition here in question will be for rights of way, and the constitutional provision permits such use, the foregoing discussion in relation to Section 5a of Article XII of the Ohio Constitution is applicable to respondent’s argument in relation to Section 2c of Article VIII.
The next issue raised by respondent is that the agreement here involved is invalid and unenforceable in that the certificate of availability for funds therefor, required under the authority of Section 131.17, Revised Code, does not refer to any “specific appropriation” made by law as required by Section 22 of Article II of the Ohio Constitution.
The pertinent part of Section 22 of Article II reads as follows:
“No money shall be drawn from the treasury except in pursuance of a specific appropriation, made by law * *
The obvious purpose of this section is to regulate the spending by the several departments of the state so that the expenditures shall be commensurate with the revenues of the state. It is conceivable that if each department were allowed *464 to spend promiscuously and draw on the state treasury at any time and for any amount which it desired to spend, the state might soon be insolvent. Therefore, the duty is placed on the General Assembly to allocate the anticipated revenues of the state among the various departments.
The requirement as to specific appropriation is not directed to the idea that for each item purchased there must be a specific appropriation but rather that before money can be spent the General Assembly must have allocated the money to the department. The only funds available to any department are, therefore, those allocated to it by the General Assembly.
The General Assembly in the statute involved in the present action (Section 5501.112, Revised Code) has directed that “the director is authorized to use any funds available to the department” in fulfilling his obligations under this agreement.
While the General Assembly may and usually does break down the appropriation to a department into different categories, such breakdown is not essential to a valid appropriation. It was not necessary that the General Assembly designate any specific fund to satisfy the obligations created under this contract to comply with the provisions of the Constitution but only that they authorize the director to use such funds as are available to him generally to fulfill his statutory duties. So long as there are funds available and unencumbered in the highway department’s appropriation, Section 131.17, Revised Code, may be complied with.
The respondent contends further that the authorization to the various boards to make such investment arrangements with the Director of Highways constitutes an impairment of the obligation of a contract.
There is no question that the funds here involved are trust funds. Nor is there any question that the employees who contribute to such funds have a vested interest in the pensions to be paid therefrom.
However, the vested contract interest of the employee is in the right to receive the pension and not in the management of the fund in relationship to the investment policies thereof. Such investment policies of necessity must be flexible and subject to change with changing economic conditions. So long as the Gen *465 eral Assembly does not exceed its legislative power in authorizing investments it may change them as to existing trust funds, and such change does not constitute the impairment of the obligation of a contract. See 35 A. L. B. (2d), 992.
It must be noted that the sections here involved give no right to the Director of Highways to invade the funds of the various boards at his own discretion or whim. The sections provide that the boards may enter into such agreements. It leaves to the discretion of the various boards whether they desire to make such investments, and it must be presumed that the boards, as trustees, will administer their duties in good faith and not enter into any agreement which they do not deem sound.
The respondent also objects to that part of the agreement which reads as follows :
“The Department of Highways shall have the -sole and exclusive use and management of said property during the time that title is held by the board, including the right to alter, repair, remodel, sell or remove the improvements situated upon the property, and the Department of Highways shall have the right to all rentals and any other income arising from the use of said property.”
This provision is in complete accord with and as a matter of fact contains the requirements set forth in Section 5501.112, Bevised Code, which provides:
“Such agreements shall provide that the Department of Highways shall have the sole and exclusive use and management of property during the time title is held by the Industrial Commission or retirement board and shall have the right to all rentals and any other income arising from the use of such property. The Director of Highways shall authorize the payment of all taxes, insurance premiums and costs of maintaining such property while under his control, and shall save the Industrial Commission or retirement board harmless from any liability whatsoever in connection with the management of such property.”
The question therefore is whether the statute authorizing such provision is valid. Despondent contends this is not a highway purpose. Under the terms of the agreement, which *466 is in effect a land contract, the state is the beneficial owner of these lands. All the matters complained of constitute an incident of ownership, and, it having been determined in the first instance that the director has the right to purchase such lands prior to actual need, it necessarily follows that as an incident of such ownership such necessary powers may be vested in the director.
Respondent further objects to that part of the agreement which provides:
“The board agrees that it will not during the period of this agreement or any renewal thereof, sell, mortgage, pledge, or otherwise encumber any of the property acquired pursuant to this agreement, otherwise than as provided in this agreement.”
Section 5501.112, Revised Code, provides in part:
“Such agreements may contain any other provisions agreed upon by the Director of Highways and the Industrial Commission or retirement board which are necessary to carry out the purpose of such agreements as indicated in this section.”
One of the provisions of this section also places the mandatory duty on the director to consummate such purchases. The plain intent of the section is to place such authority in the Director of Highways as to enable him to expeditiously carry out the objectives of the statute. The prohibitions contained in the agreement against selling, mortgaging, pledging, or otherwise encumbering the property are obviously necessary restrictions if the purpose of the statute is to be carried out. Therefore, we cannot say that such provisions are unreasonable or invalid.
The question next raised is the validity of that part of Section 5501.112, Revised Code, which requires the director to pay the taxes on such property. It being contended that, since the taxes are levied against the board, payment of the taxes violates the provisions of Section 4 of Article VIII prohibiting the loaning of the state’s credit.
The duty to make such payments is placed by the statute in the first instance on the director. It does, not constitute a lending of the state’s credit as it is one of the incidental costs of the purchase of the land.
The same is true in relation to the five per cent increment *467 provided by tbe contract. It is one of the incidental expenses which the state must assume, and the assumption of such cost does not violate the provisions of the Constitution relating to the giving or loaning of .the credit of the state.
It is our conclusion that only two contentions raised by the respondent have constituted serious objections to the constitutionality of the statute and the agreement here involved. The first being the contention that the statute and the agreement authorize and create a debt of the state and the second being the contention that an expenditure for the advance acquisition of highway rights of way does not constitute an expenditure for a statutory highway purpose. We have refuted both such contentions on the following grounds:
(1) The acquisition of rights of way constitutes purchases for a statutory highway purpose, and the fact that such acquisition is made in advance of the time of actual contract letting for such an improvement does not prevent the transaction from being properly characterized as “an expenditure for a statutory highway purpose”; in fact, such advance purchase is economically sound and reasonable.
(2) The agreement and statute here involved do not authorize or create a debt of the state because (a) an appropriation is in existence to support the original agreement, (b) a new appropriation is made a necessary prerequisite to a renewal of' the agreement, and the obtaining of a certificate of availability of funds in compliance with Section 131.17, Revised Code, is also made a requirement, (c) only contracts not exceeding two years duration are authorized by this statute and by the agreement, and (d) subsequent General Assemblies are in no way bound by this agreement or renewals thereof.
Consequently, the demurrer to the answer is sustained, and the writ of mandamus prayed for is allowed.

Writ allowed.

Weygandt, C. J., Zimmerman, Bell and Herbert, JJ., concur.
Taet, J., dissents.
Peck, J., not participating.